Final case for oral argument, 07-1045, Pfizer v. Synthon Holdings. Mr. Morrow, whenever you're ready. Thank you, Your Honor. May it please the Court, Thomas Morrow for appellants. The judgment of the district court should be reversed on three independent grounds. First, claims 1 to 3 of the 303 patent are invalid for obviousness. Second, claims are invalid for failure to claim should be declared invalid under the doctrine of collateral estoppel based on the ruling in the Apotex case. Turning first to the obviousness question. Well, do we really need to cover that because of Pfizer v. Apotex case has already decided to use it? I don't believe so, Your Honor, with one exception, and that is on unexpected results, there was additional evidence in the Synthon case, which I think the Court ought to just be aware of. It's in our briefs, and that relates to the fact that the claim covers both anhydrous amlodipine-bezylate and amlodipine-bezylate monohydrate. The evidence in the Synthon case is that there is absolutely no effort to even show unexpected results as to the amlodipine-bezylate monohydrate. In other words, any results that might be relied on by Pfizer are not commensurate with scope with the claim. The District Court made one fact-finding in that regard, and that fact-finding is clearly erroneous. The District Court said that the amlodipine-bezylate compounds had superior solubility to amlodipine malate. That fact-finding is clearly erroneous. The 303 patent itself says that any solubility greater than one nanogram per milliliter is There simply is no advantage over amlodipine malate. Other than that, the obviousness question, unless the Court has additional questions, we can move to written description. Why don't we move to the issue of collateral estoppel, as to whether or not collateral estoppel would apply against Pfizer because of the Pfizer Epitex decision? And when does it apply? Yes. I believe the only issue that Pfizer raised in its brief on the collateral estoppel issue was its view that the judgment in the Epitex case is not a final decision for collateral estoppel purposes until the mandate issue is in that case. We don't believe that that's appropriate. The Fourth Circuit, regional circuit law would apply to finality. I believe the Pharmacia case makes that clear. And the Fourth Circuit has a flexible test for finality. For example, in the Swentech case that we cited in our papers, there was a trial. After fact findings were made in that trial, the judge ordered a second trial, a retrial, of some issues in the case and held collateral estoppel as to other issues that were not going to be subject to the second trial. So in other words, even though there had not yet been a full trial and judgment of all issues in the District Court, even though there were further proceedings in that District Court, there was collateral estoppel as to the issues that had already been litigated and decided. But if a mandate is not issued from this Court regarding the judgment in Pfizer v. Epitex, it would still be subject to review on a petition for re-hearing and re-hearing in Bonk. What if the Court decides to take the case up in Bonk and reverses it? What happens to the collateral estoppel issue? That's similar to other instances where collateral estoppel is applied. In the Dana v. NLK case cited in our papers, it was clear that further appellate proceedings could be in the offing. Collateral estoppel was applied even during the pendency of the appeal. In other words, in the case that was akin to the Synthon case, the appeal was pending when the decision came down in the other case. Collateral estoppel was applied. In the Pharmacy v. Upjohn case, which I think is perhaps closest factually, there was a District Court case which was pending. A motion for judgment as a matter of law was pending in the District Court case. The decision was rendered by this Court, I believe, in validating the patent in its collateral litigation. And collateral estoppel was applied notwithstanding the pending JMOL motion, notwithstanding the possibility of further appellate review. All of the issues as to validity were decided in the other case. But here we have an Ander situation, right? Does the Ander environment change that somewhat? Does the Ander environment change it? I think just in terms of the criticality of the timing here, Your Honor. Now, who was the first to file against the patent? Was it Apotex? It was Mylan. Apotex was not the first to file. Where do you stand on the chain? You're the second or the third? We are past Apotex and Mylan. Dr. Reddy's might have been before or after us. I'm not quite sure. Does that impact the issue of collateral estoppel at all? Your Honor, I don't believe that the order of filing or the fact that it's an Ander case necessarily impacts on collateral estoppel. The timing here, though, is very important because the 303 patent, the Court is aware, has expired with a period of pediatric exclusivity that Pfizer is attempting to apply against the other generics. And so the pendency of the proceedings leading up to the issuance of the mandate, the delay that's inherent in that process, in and of itself, is causing severe prejudice to our client. Our client made the investment, challenged the patent, filed a Paragraph 4 certification, was sued for infringement, fought that case through the District Court, clearly erroneous judgment in the District Court, filed an appeal, attempted to expedite the appeal, self-expedited it through the District Court. And we have a decision which fully disposes of the obviousness issue in the case. Well, that's only because of the actions that have been taken by this Court. Correct, Your Honor. The trial court here ruled against you. That's correct, Your Honor. So we would have to take the issue regarding the patent validity based upon our decision, not on another District Court decision. Well, on either grounds, the record on obviousness is remarkably parallel in both cases for collateral and estoppel purposes, it wouldn't even matter, but the records are very, very similar in both cases. We believe that because of the adjudication on the Apotex panel, there is a decision, a final decision. It's subject to potential further review, we understand that, but collateral and estoppel can and should apply. But the evidence is also before this Court, which could summarily reverse the judgment of the District Court on grounds very similar to those invoked in the Apotex case. Well, the patent expires sometime in September. The six-month pediatric extension extended it through September. That's correct, Your Honor. So you essentially have, if the collateral estoppel issue applies before the mandate, then you would be able to go to the market with your drug based upon the decision of this Court. Presumably we would be able to take the decision of this Court. Hypothetically, if the collateral estoppel would be applied prior to the mandate. However, Apotex would still be in a different position because their mandate has an issue. I understand. I'm not sure that Apotex and Synthon would be in different positions necessarily vis-a-vis FDA. I'm not sure what FDA's view would be. They might wish to see a mandate from both parties. I just don't know how FDA would treat it. But right now we're in a different position from Apotex in the sense that we don't even have a decision from the Court without a mandate of invalidity. Would the FDA really require a mandate from the Court or could they issue the certificate prior to the mandate? I believe that FDA may be looking for a mandate, although I'm not the expert on that issue in this particular case. I know there's been a lot of activity with FDA vis-a-vis these two cases, and I understand that Highland is the only company with FDA approval. Apotex, despite the panel decision that it has in its case, as I understand it, does not have FDA approval. Thank you. On written description, this is a separate independent ground for invalidity. The claim, as I mentioned earlier, covers anhydrous amylodipine-besalate and amylodipine-besalate monohydrate. Under In re Curtis, disclosure of only one species is not sufficient to provide a written description for a genus claim unless there is predictability across the species that are claimed. Here, there's only one species disclosed in the 303 patent. That's the anhydrous amylodipine-besalate. And the undisputed evidence in the record below is that there is no predictability as to the physical properties between anhydrous amylodipine-besalate and amylodipine-besalate monohydrate. Dr. Platt, who was a Pfizer scientist who did a lot of testing, the inventors themselves, testified that you can't predict across the species in this case. Dr. Platt's testimony is A13764, and Dr. Wells' testimony, the inventor, A12090. Simply put here, the inventors made a contribution in the patent disclosure of one compound, anhydrous amylodipine-besalate. That was the scope of the disclosure. The claim was to at least two compounds, probably three of dihydrate. Synthon's product is not the anhydrous amylodipine-besalate that's in the patent description. It is the monohydrate compound. There's no predictability across the range of that claim, and under Curtis and cases such as Bilstadt, that claim fails the written description requirements. It's just the simple proposition that you can't take back more than you give in your disclosure. Here, the disclosure was limited. There's no predictability from the disclosure to the Vis-a-vis the recent KSR decision, I don't think that it truly impacts the analysis in this case, other than to make clear that the flexibility and common sense, which was expressed in the aptex panel decision, clearly is part of what the court's required analysis is at this point. If the court has additional questions, I'd be happy to answer them. Thank you, Mr. Monroe. Thank you. Mr. Greco. Good morning, Your Honors. I'm Richard Greco. I represent Pfizer on this appeal. We'd like to first address the elephant in the room, if you will, the collateral estoppel issue, which is, I think, critical here. Does a flexible standard apply in the Fourth Circuit? It's a flexible standard, but you still need a final disposition. And all the cases, for example, the Pfizer versus, or the Upjohn versus case that, Mylan versus Mylan case that Mr. Maloro just mentioned, in all of those cases where you're applying collateral estoppel before the end of all the appeal processes, they're applying a legally effective judgment that determined the rights of the party as of that moment, unless it's changed. So if you have a district court judgment and you have a motion for JMOL, that judgment, if the patent's invalid, the patent's still invalid unless the court of appeals reverses it. The Pharmacia case cited references that finality is a flexible concept. It means a little more than the litigation has reached a stage where there is really no good reason to continue litigation. And in light of the prior decision by the Federal Circuit in validating the patent at issue, haven't we reached that stage? No, because that decision is not yet legally effective unless and until the mandate issues. The process is not finished yet. It has not finally determined the rights of the parties. As the Supreme Court itself has said in Missouri versus Jenkins, that while a petition for rehearing is pending, there is no judgment to be reviewed. They said that in the context of timeliness on the cert petition. The legal posture of this case is that all three district courts below found the patent valid and infringed. We have a Federal Circuit decision holding it invalid. There's a petition for rehearing that has been pending and a briefing on that has been completed as of May 1st. But there's no final result of that appellate process until the mandate issues. So while this court is in position at the moment to look at this case, it has that opinion, but it is not bound by it as a matter of collateral estoppel because that process hasn't yet finished. And the legal posture of where we are as far as any enforceable legal judgments exist is that the only enforceable legal judgments are that the patent is valid. And unless and until the mandate issues without a change, that's where we stand right now. I guess we could decide the case differently than FISA v. Apotex and create an inter-circuit conflict, right? You can, and I would argue and will argue that you should for the reasons that I'll get to. On what grounds would we be able to do that? I think there's... Because one panel still needs to follow another panel's decision, right? Well, the rule in this circuit is that if a panel decision conflicts with the earlier panel decisions of this court, it is the earlier and not the later decision that governs. That's the South Court of Texas American Law. That's a well-established rule in the circuit. And I would submit to you that the Apotex decision is inconsistent with the prior precedence of this court as well as with the reasoning of KSR, which came down, of course, after that I'd like to talk about at least first the overcoming prima facie obviousness issue because I think that's the clearest and that was the issue that was really before the court in Apotex. It has always been the law of the circuit for a long time. Excuse me, Mr. Greco. Before we get to that point, assuming that FISA v. Apotex is mandated, then we must fall for it. Is that correct? If once the mandate issues, then there would be a basis for collateral estoppel. Okay. You know, then that's it. I'm sorry to interrupt. All right. No, that's fine. The point, the law has always been if you have, since at least Popesh and even earlier, because that case cites many earlier cases, that if you have unexpected superior properties of a practical value for a chemical compound, that compound is patentable and is not obvious even if it were prima facie obvious. Now the findings of fact here, unlike in the Apotex case, which there was a dictated opinion from the bench, so we didn't have a lot of detailed findings. Here we have findings in exquisite detail that the properties of a new salt are entirely unpredictable. And the unpredictability of those properties was not challenged at the trial here. Synthon's own experts, Dr. Coquerel said, when he was explaining how you can't predict the properties of a hydrate, he agreed you couldn't predict the properties of an entirely new salt. He said, we can't do that. Prediction is beyond us. Can't predict, can't do anything in terms of prediction is his exact words. Dr. Kibbe, who said you can predict that you'll get a proton transfer and a reaction, and in some sense that's a salt, but he agreed that you couldn't predict whether it was going to be usable for you. And Dr. Anderson consistently testified that the properties of a new salt are unpredictable. Even if you use an anion that had been previously used, you have no idea what you're going to get and you cannot say that it will even be acceptable. Certainly you cannot say that it's going to be superior to anything else you have. It is pure trial and error, pure empirical science. And in fact in this case, interestingly, the backup compound for amlodipine, another dihydropyridine, similar structure, primary amine, they tried to make a mesylate salt out of that, immediately degraded into something that was inactive. They tried to make the mesylate salt, it became an oil. Completely different than what happened with amlodipine, even though they were closely related compounds. And there are many other examples of those kinds of transfers. The only thing that, the fact, the only fact that it helps you with, that an anion had been previously used, is it may help you persuade the FDA about its safety, but it does nothing in terms of predictability. So we had a situation here where the prior art, only one salt of amlodipine in the prior art, amlodipine maliate, was very unstable. It was, the memos from upper management in April 1985, a year before a patent was filed, said that the instability precluded commercialization of amlodipine maliate. Dr. Wells himself was suggesting, you know, if we can't find another salt, maybe we should use a different compound. Dr. Platt, at the outset of this project, he was warning Dr. Wells, you know, if you look for another salt, you're just going to be trading one problem for another. Maybe it's not even worth doing. They had these serious problems to deal with. They had no predictable solution. There was no ability to predict that there is a solution. It might have been that all the salts that you could make would have been equally bad as maliate, would have been equally unstable. There was no reason in science why it would have to be better, and in fact, they went ahead with a number of different acids because, as the inventor said, you just have to make them and see what comes out. What came out with Bessalate was a salt that not only solved the stability problem, it solved an equally important problem with processability, and it had no negative side effects, unlike every other amlodipine salt. There was no trade-off with amlodipine Bessalate. All four properties were good. Every other salt had at least a negative of some sort. Bessalate was more stable, but it was extremely hygroscopic. Hydrochloride, which almost everybody uses, was less stable, much more sticky, hygroscopic. They all had trade-offs, and that's what the Gould article, which Sid Platt introduced, says you could expect. So you have a problem, you find a superior result that not only solves the problem, but gives an unexpected combination of good properties, as the court found based on substantial evidence, and those properties have a practical value. They go from a stability problem that the judgment of Pfizer was that it couldn't be commercialized to the most successful cardiovascular drug in the world, from one where they could not successfully make a direct compression tablet with amlodipine malate to one where they've made billions of tablets with no problem and with no trade-offs. That law and the findings of fact here, essentially unchallenged, established that there was, even if there was a prima facie case of obviousness, that it was overcome. But even on the prima facie case, I'd like to get to KSR briefly. KSR opinion emphasized throughout that predictability is an important aspect of obviousness. They certainly said you don't need a rigid rule for motivation, and talked about common sense, which in a mechanical case may make sense. I'm not sure how one applies common sense to making a new chemical compound. There's no common sense in chemistry? Well, there is, at least not in the, I think what the court was referring to common sense is what a layperson could look at and say that makes perfect sense. There are rules in chemistry, but there are scientific rules. I'm not sure common sense is the right way to describe that. But even putting the motivation issue aside, predictability was essential. They found the combination obvious when it yields no more than predictable results. Combinations must do more than yield predictable results. Even in obviousness to try, they talked about a finite number of predictable solutions that lead to an anticipated success. You don't have that here. Undisputed evidence, detailed findings of fact. You could not have predicted whether any of the acids in addition to maliate would be successful as a pharmaceutical solve, particularly for claim three, which requires that it be usable to make a tablet. Nobody testified that you could make that prediction. In fact, all the testimony was that you could not. What about the rest of the claims? The rest of the claims were not an issue, just claims one through three. One through three were an issue. What happens to the rest of the claims? Well, they're not, technically they're not held invalid and they'll be an issue in the antecedents. At the moment, the FDA has ruled they're not doing anything with Apotex until the mandate comes down. They've denied Mylan's 180-day exclusivity after the patent expires, but they held all the other generics other than Apotex are bound by pediatric exclusivity, at least until those cases are mature. Does the patent remain on the orange book with the other claims? It remains there now. If the mandate issues and the first three claims are invalid, Mylan had argued the patent should still remain issued. It would be a decision for Pfizer to make in the first instance whether the other claims could be reasonably asserted against somebody who practices those other claims, which was not the issue in this case. But an issue were only claims one through three, as I understand it now. That's right. In this case, that's right. If, in fact, the patent stays valid, does that maintain Mylan's 180-day exclusivity at that point? Not according to the FDA or the district court of the D.C. district court. That's on its way to the D.C. circuit to determine whether 180-day exclusivity expires with the expiration of the patent, as the FDA has ruled, or whether it continues regardless of the expiration. The expiration as of the time of the pediatric extension, though. The FDA ruled that the 180-day first-to-challenge exclusivity ends on the date the patent itself  Not the pediatric extension. Not the pediatric. They're saying Mylan no longer has 180-day exclusivity, although they have approval on the market. I'd like to address, secondly, the written description issue. What you must describe is what you're actually claiming. And here, what they're claiming, what the patent claims, among claim one, is a salt amlodipine besulate. It's well known in the art that salts can have different physical forms. This patent has at least three. It has a crystal amlodipine besulate. It has a melting point, so it has an amorphous amlodipine besulate. And it has amlodipine besulate in solution. The fact that the claim covers different forms, like hydrates, doesn't mean that the patent must list and describe every physical state that the salt can assume. The claim is this, what is a salt? A salt is a combination of an acid and a base. That's that product. Now once you make that combination, you can explore what its properties are. One of the properties of amlodipine besulate is if you make that combination with water, it forms a hydrate. The patent itself doesn't restrict how you make amlodipine besulate. It says that any inert solvent. The patent itself also actually discloses inherently a hydrate of amlodipine besulate because it does a solubility experiment in water. And it was admitted again by Synthon's expert, Dr. Cocquerel, and also testimony from Pfizer's witnesses and documents, that when you do the solubility experiment, what precipitates out is the hydrate form. So when you measure solubility of amlodipine besulate, you're measuring amlodipine besulate hydrate, not amlodipine besulate anhydrous. So that's right in the patent, anybody doing the solubility experiment. And as Dr. Anderson testified, everyone would know that hydrates are possible depending on the particular circumstances that you make it in. One does not have to describe every physical form of a new chemical entity in order to describe it. We describe it when we say amlodipine and besulate come together as a new salt. And in fact, the position here is quite inconsistent with their obviousness case. Because they're saying, look, it's obvious to make amlodipine besulate because you could combine those two things. But yet, somehow that doesn't include the hydrate. Even though, depending on how you make the salt, you could very well end up with a hydrate if you use water instead of IMS. The fact is that the patent does describe what everyone agreed to is the definition of the salt, amlodipine and besulate. And it shows it in different physical forms. And it need not elaborate every possible physical form. In terms of superior properties for the hydrate, just very briefly. Mr. Burkle, your time is up. Why don't you finish your sentence? Synthon's own patent on amlodipine besulate monohydrate admitted that it was equally stable to the anhydrous form. And their tablets were processed without any difficulty, without any extra lubricant. So their own patent shows that the hydrate is equal in those two key properties to the anhydrous, and the evidence showed that the anhydrous was superior to the maliate. And that alone would be sufficient. Even if we had to prove the hydrate's superiority. Thank you. That's a full paragraph, but that's all right. Thank you. Mr. Maloro, you have three minutes and 30 seconds. I'd like to respond on two points primarily. On collateral estoppel, Mr. Greco made the point that there's not an enforceable judgment in the Apotex case until the mandate issues. The case law, I think, focuses on the conclusiveness of the decision. The Miller case cited in our paper says finality, as in section 1291, is not required for collateral estoppel purposes. The Swentech case also says it's the conclusiveness of the decision. Now conclusiveness is has the issue been decided, not is it somehow subject to further review and therefore not final in the sense that it will never change. There's no more to be decided on the obviousness issue in the Apotex case. Other people may review it, but that doesn't mean that the issue has not been decided by this court. Now with regard to the written description argument that Mr. Greco presented, he said that amlodipine-besley monohydrate is simply a different form from anhydrous amlodipine-besley. It's not a different form. It's a different chemical compound. These chemical compounds have different crystalline structures, different molecular weights, different empirical formulas, different chemical formulas, different physical properties. These are two distinct chemical compounds claimed within one claim. Therefore, the scope of any unexpected results has to be commensurate with the scope of the written description. If there's no predictability from one species to the other, which is the undisputed evidence here, then you cannot simply disclose one species, the anhydrous compound, and claim two. The court has no further questions. Thank you, Mr. Maloro. Any other questions? Case is submitted.